[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *Rite Aid of Ohio, Inc. v. Washington Cty. Bd. of Revision,* Slip Opinion No. 2016-Ohio-371.]

NOTICE

This slip opinion is subject to formal revision before it is published in an advance sheet of the Ohio Official Reports. Readers are requested to promptly notify the Reporter of Decisions, Supreme Court of Ohio, 65 South Front Street, Columbus, Ohio 43215, of any typographical or other formal errors in the opinion, in order that corrections may be made before the opinion is published.

SLIP OPINION NO. 2016-OHIO-371

RITE AID OF OHIO, INC., APPELLEE, *v.* WASHINGTON COUNTY BOARD OF REVISION ET AL., APPELLANTS.

**[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *Rite Aid of Ohio, Inc. v. Washington Cty. Bd. of Revision,* Slip Opinion No. 2016-Ohio-371.]**

*Taxation—Real-property valuation—Because a long-term lease affects sale price and value, the sale price of a leased-fee comparable should be adjusted when the subject property has no lease—Special-purpose doctrine not applicable—Decision of the Board of Tax Appeals affirmed.*

(No. 2014-0828—Submitted August 11, 2015—Decided February 4, 2016.)

APPEAL from the Board of Tax Appeals, No. 2011-1760.

————————————

**Per Curiam.**

{¶ 1} This real-property-valuation case concerns the tax-year-2010 valuation of multiple parcels that together constitute a Rite Aid drugstore and its parking lot in Marietta. In that sexennial reappraisal year, the Washington County

Auditor, an appellant here, determined a value of approximately $3,319,000 for the store. Appellee, Rite Aid of Ohio, Inc., filed a complaint before the Washington County Board of Revision ("BOR"), also an appellant here, and presented an opinion seeking a reduction, but the BOR retained the auditor's valuation. On appeal at the Board of Tax Appeals ("BTA"), Rite Aid and the county presented competing appraisals. The BTA adopted Rite Aid's appraisal, and the county has appealed.

{¶ 2} The county argues that our decision in *Meijer Stores Ltd. Partnership v. Franklin Cty. Bd. of Revision*, 122 Ohio St.3d 447, 2009-Ohio-3479, 912 N.E.2d 560, requires the use of the kind of comparables that the county's appraiser relied upon. We disagree, and we therefore affirm the decision of the BTA.

## FACTUAL BACKGROUND

{¶ 3} The property at issue consists of 1.13 acres in downtown Marietta that are improved with an 11,052-square-foot building constructed in 1999. According to Rite Aid's complaint, the auditor determined a total fair-market value for the parcels of approximately $3,319,000; Rite Aid sought a reduction to $1,396,920. The BOR held a hearing on May 24, 2011. Rite Aid's attorney appeared on behalf of the property owner; the board of education was not represented at the hearing.

{¶ 4} At the BOR hearing, Rite Aid's attorney presented a summary of information developed by a contractor, International Appraisals, for Rite Aid, showing sale comparables and rent comparables in the geographic region. The attorney explicitly disavowed providing an appraisal in a formal sense and also stated that the contractor was not able to find any drugstore sales in the area considered. The BOR's consultant recommended no change in property value, and the BOR adopted that recommendation on June 15, 2011.

2

*The competing appraisals and theories at the BTA*

**{¶ 5}** Rite Aid appealed to the BTA, which held a hearing on June 12, 2013. At the BTA hearing, Rite Aid presented an appraisal report and testimony by Geoffrey Hatcher, MAI. The county presented its own appraisal report and testimony by Karen Blosser, MAI.

**{¶ 6}** Both appraisers found the cost approach inapplicable, primarily because the building was already ten years old as of the lien date. Blosser stated as well that she did not have sufficient data to compute the obsolescence deduction in light of the economic recession.

**{¶ 7}** The competing statements of counsel at the opening of the BTA hearing reflect the different approaches taken by the appraisers in the light of differing understandings of the law of property-tax valuation. The owner's counsel summarized its appraiser's approach as one that evaluated the Rite Aid property by "look[ing] at comparable properties both for sale and for lease in the general geographic area of the subject property," but not just as a drugstore, whereas the county's appraisal "looked at only drugstores for their * * * comparables scattered around the State of Ohio."

**{¶ 8}** The county's counsel did not contest her opposing counsel's characterization of her own appraiser's evidence; indeed, she countered by stating, "[T]he most competent and probative evidence of value is going to be presented through the appraisal of Karen Blosser, our appraiser, in which she appraises the property as it actually existed on the tax lien date *as a Rite Aid*." (Emphasis added.) In other words, the county posits a valuation in terms of continued use by Rite Aid *even after a putative sale*, presumably with the drugstore continuing as lessee under a long-term lease. As counsel stated, this does resemble the existing use as of the lien date; but it also differs from the manner in which the property was held on the lien date because this property—unlike all of Blosser's comparables—was not subject to a lease.

{¶ 9} True to counsel's description, Rite Aid's appraiser, Hatcher, had selected six sale comparables—general retail rather than drugstores—with three located in Zanesville, one in Nelsonville, one in Parkersburg, West Virginia (just across the Ohio River, near Marietta), and one in Vienna, West Virginia. These stores ranged from $59.87 per square foot to $103.26 per square foot in sale price, and Hatcher settled (after adjustments for building size) on $100 per square foot for the subject property. Hatcher did not completely ignore leased properties: one of his comparables was a Family Dollar that was subject to a lease, for which circumstance Hatcher made no adjustment, on account of lack of information.

{¶ 10} By contrast, Blosser selected five sale comparables, all drugstores, all geographically distant. Two were Walgreens (one in Canton, one in Medina), one was a former Rite Aid (in Columbus on Bethel Road), and two were Dayton-area stores: a current Rite Aid in Englewood and a CVS in Dayton. *All* were apparently encumbered by leases at the time of sale—in other words, they were sold subject to long-term leases. The leases were said to be "at approximately market terms." The appraisal report then states: "As the subject is being valued based upon market terms, *no adjustments were required*." (Emphasis added.)

{¶ 11} At the BTA hearing, Hatcher testified that he had looked at sales of drugstores but that "most of them were sale leaseback transactions." And most involved CVS and Walgreens, which were "higher credit rated tenants" than Rite Aid.

{¶ 12} Hatcher also testified to two matters relating to the competing appraisal theories of the parties. First, he testified that nothing about the subject parcel and building made it a special-purpose facility usable only for a retail drugstore and that if it were sold, it would likely go on the market for general retail purposes. Second, he distinguished between the leased-fee market and the market for owner-occupied properties like the subject property.

4

{¶ 13} Both appraisers also performed an income-approach valuation, for which they utilized rent comparables. In this regard, Hatcher looked at numerous leased properties within the Marietta and Parkersburg area, surveying the general lease market, and obtaining lease information from shopping malls' anchor and in-line stores. Hatcher also collected information on Rite Aid store leases as a reference, but relied on the general retail leases. He selected a rent of $12 per square foot based on its being at the upper end of the general lease market.[1] After accounting for vacancy and collection loss and expenses and extracting a capitalization rate, Hatcher arrived at an income-approach valuation of $1,180,000.

{¶ 14} For her part, Blosser based her market-rent calculation on her extensive leased-fee study of first-generation drugstores; on that basis, she posited market rent of $21 per square foot (compared to $12 per square foot in Hatcher's appraisal). Based again on the leased-fee analysis, a low 5 percent vacancy and collection loss was applied (compared to 10 percent by Hatcher). Blosser's capitalization rate was 8.07 percent (compared to Hatcher's 9.5 percent). Blosser's income-approach valuation was $2,600,000.

{¶ 15} Hatcher reconciled his sales comparison approach ($1,115,000) with his income approach ($1,180,000) to arrive at a value of $1,150,000 for the drugstore property at issue. Blosser reconciled her sales-comparison ($2,200,000) and income methods ($2,600,000) to a value of $2,400,000. The disparity of valuations is striking: Blosser's valuation is more than twice that of Hatcher's.

*The BTA's decision*

{¶ 16} The BTA's analysis of the appraisals is terse. The board drew the contrast between Hatcher's general-market survey versus Blosser's focus on leased drugstores. The BTA found "Hatcher's sale and lease comparables [to be]

---

[1] The average rent for the general retail leases was $10.16 per square foot; the average rent for the Rite Aid drugstore leases was $12.62 per square foot.

more comparable to the subject property," with the result that the board found his valuation more persuasive. BTA No. 2011-1760, 2014 WL 2708165, *1 (Apr. 22, 2014). In footnotes, the BTA opined that Blosser's comparables were drawn from larger urban areas of Ohio and, as a premise for concluding that Hatcher's appraisal was more persuasive, expressed its view that use of leased-fee comparables such as those Blosser relied upon, while potentially appropriate, was not necessary. The BTA adopted the Hatcher appraisal as the value of the property.

**{¶ 17}** The county has appealed, and we now affirm.

### AS A GENERAL RULE, THE SALE PRICES OF LEASED-FEE PROPERTIES SHOULD BE ADJUSTED WHEN USED TO DETERMINE THE VALUE OF AN UNLEASED SUBJECT

**{¶ 18}** The county first emphasizes the doctrine that a sale price of property encumbered with a long-term lease constitutes the value of the property without adjustment for the effect of the lease on the price. *See Cummins Property Servs., L.L.C. v. Franklin Cty. Bd. of Revision*, 117 Ohio St.3d 516, 2008-Ohio-1473, 885 N.E.2d 222, ¶ 16-18 ("the arm's-length sale price of a legal fee interest should not be adjusted on account of the mere existence of an encumbrance"); *AEI Net Lease Income & Growth Fund v. Erie Cty. Bd. of Revision*, 119 Ohio St.3d 563, 2008-Ohio-5203, 895 N.E.2d 830, ¶ 17 (elevated sale price attributable to above-market lease payments resulting from an earlier sale-leaseback transaction *not* required to be adjusted).[2]

**{¶ 19}** The county uses that case law, which speaks to determining the value of property encumbered by a lease, as support for a very different

---

[2] After amendment in 2012, R.C. 5713.03 now makes the use of an arm's-length sale price discretionary and also requires county auditors to value property based on the value of the unencumbered fee simple. *See* 2012 Am.Sub.H.B. No. 487, further amended by 2012 Am.Sub.H.B. No. 510. A different rule therefore applies today, but the rule articulated in *Cummins* would be applicable to a 2010 valuation.

proposition: that in determining the value of an *unencumbered parcel* of realty, the sale price of *encumbered parcels* should not be adjusted.

{¶ 20} We find this argument to be illogical on its face. Precisely because the lease affects the sale price and value, the leased-fee comparable ought to be adjusted when the subject property has no lease; the adjustment would remove the effect of the lease on the sale price so that the sale can indicate what the unencumbered subject property would sell for. *Steak 'n Shake, Inc. v. Warren Cty Bd. of Revision*, ___ Ohio St.3d ___, 2015-Ohio-4836, ___ N.E.3d ___, ¶ 36.

{¶ 21} The rent in a build-to-suit drugstore is often above market, which will elevate its sale price. *See, e.g.*, *Rhodes v. Hamilton Cty. Bd. of Revision*, 117 Ohio St.3d 532, 2008-Ohio-1595, 885 N.E.2d 236, ¶ 3, 5-6 (sale price of build-to-suit drugstore with admittedly above-market rent was found to be the value of the property). To the extent that building costs, by being included in elevated lease payments, have been incorporated into the value of the realty, an adjustment would need to be made to determine the value of a different drugstore property that was not so encumbered.

{¶ 22} That is the general rule. Unless an exception to that rule applies, the rule furnishes a strong reason to affirm the decision of the BTA.

## UNDER OHIO LAW, EXCHANGE VALUE IS THE RULE AND USE VALUATION IS A LIMITED EXCEPTION TO THE RULE

{¶ 23} The proper analysis of this appeal calls for a recapitulation of the "first principles" of valuing property for tax purposes in this state.

{¶ 24} As a general matter, the Ohio Constitution provides, "Land and improvements thereon shall be taxed by uniform rule according to value * * *." Value in the context of ad valorem taxation of property is defined in terms of the *exchange* value rather than the current-use value. The general rule is as follows:

> In the last analysis the value or true value in money of any property is the amount for which that property would sell on the open market by a willing seller to a willing buyer. In essence, the value of property is the amount of money for which it may be exchanged, *i.e.*, the sales price.

*State ex rel. Park Invest. Co. v. Bd. of Tax Appeals*, 175 Ohio St. 410, 412, 195 N.E.2d 908 (1964).

**{¶ 25}** Two corollaries were drawn by the court in *Park Invest. Co.*: first, that a recent, arm's-length sale price "will usually determine the monetary value of the property" and second, that absent such a sale price, an appraisal indicates value when it "determine[s] the amount which such property should bring if sold on the open market." *Id.*

**{¶ 26}** Indeed, we have applied these principles as a constitutional limitation on the legislative power to define property value. *State ex rel. Park Invest. Co. v. Bd. of Tax Appeals*, 32 Ohio St.2d 28, 32-33, 289 N.E.2d 579 (1972). During the course of litigation following our 1964 *Park Invest. Co.* opinion, the legislature in 1972 enacted Am.Sub.S.B. No. 455, which amended R.C. 5715.01 to impose the following requirement:

> Such true value shall take into consideration its current use without regard to neighborhood land use of a more intensive nature. The rule to be adopted shall have standards for the determination of true value which will preclude the use of factors or circumstances of a speculative nature.

134 Ohio Laws, Part I, 868.

**{¶ 27}** In our 1972 *Park Invest. Co.* opinion, we rejected "the statutory provision establishing the current use of real property as the basis for valuation pursuant to a uniform tax assessment," predicating our holding on our interpretation of the constitutional term "value" in our 1964 *Park Invest. Co.* opinion:

> Since the current use method of evaluation excludes, among other factors, location and speculative value which comprise market value, such current use method cannot be made the basis for valuation of real property for tax assessment purposes, and that portion of Amended Substitute Senate Bill No. 455 making provision for such method of valuation is invalid, as being contrary to Section 2, Article XII of the Ohio Constitution, which enjoins that "land and improvements thereon shall be taxed by uniform rule according to value."

32 Ohio St.2d at 32-33.

**{¶ 28}** But the rule of market-exchange valuation is not a rule without exception. For one thing, the state constitution itself expressly permits farmland to be valued for tax purposes according to its current agricultural use rather than according to its highest and best value in the market. Ohio Constitution, Article II, Section 36; *see also, e.g.*, *Maralgate, L.L.C. v. Greene Cty. Bd. of Revision*, 130 Ohio St.3d 316, 2011-Ohio-5448, 958 N.E.2d 153, ¶ 13.

**{¶ 29}** We have recognized another permissible example of use valuation. The lead case is *Dinner Bell Meats, Inc. v. Cuyahoga Cty. Bd. of Revision*, 12 Ohio St.3d 270, 466 N.E.2d 909 (1984). In *Dinner Bell Meats*, two competing appraisals employed differing cost approaches based on their respective findings that the property was "special purpose" in nature. The court concluded that "in

utilizing the 'cost approach' for a 'special purpose' building," the appraiser "simply considered the utility of the properties in conjunction with the highest and best use of the meatpacking facility." *Id*. at 272. In holding that the approach was a proper cost approach and not a prohibited "current use" appraisal, the court acknowledged the general principle that " 'the special purpose exception is applied to a building in good condition being used currently and for the foreseeable future for the unique purpose for which it was built,' " a doctrine necessary to prevent "the owner of a distinctive, but yet highly useful, building" from "escap[ing] full property tax liability." *Id*., quoting *Fed. Res. Bank of Minneapolis v. State*, 313 N.W.2d 619, 623 (Minn.1981).

{¶ 30} Later, in *Meijer, Inc. v. Montgomery Cty. Bd. of Revision*, 75 Ohio St.3d 181, 661 N.E.2d 1056 (1996), we affirmed a BTA decision over arguments similar to those advanced and rejected in *Dinner Bell Meats*. In the context of resolving a battle of appraisals, the BTA in *Meijer, Inc.* declined to adopt the larger amount of obsolescence found by the owner's appraiser. The BTA found "nothing about the present property [that was] obsolete or useless to the owner due to changing business conditions." *Meijer, Inc. v. Montgomery Cty. Bd. of Revision*, BTA Nos. 93-M-731, 93-M-732, and 93-M-733, 1995 WL 59106, *11 (Feb. 8, 1995). Indeed, "[t]he owner, by purchasing the land and constructing the building, evidences a market need for such a property. Therefore the costs of purchase and construction evidence that a prospective purchaser was willing to pay at least the costs of the property as newly constructed." *Id*. at *12; *see also Oakwood Club v. Cuyahoga Cty. Bd. of Revision*, 70 Ohio St.3d 241, 638 N.E.2d 547 (1994) (invoking *Dinner Bell Meats* to overrule the property owner's contention that the county's appraiser had performed a value-in-use analysis for its golf-course facility).

{¶ 31} In both *Dinner Bell Meats* and *Oakwood Club*, we disclaimed that use valuation was being performed. In *Dinner Bell Meats*, we said, "The record

10

supports the conclusion that Kaplan's report was a proper 'cost approach' appraisal, not a 'current use appraisal as proscribed under the *Park Investment Co.* series of cases." 12 Ohio St.2d at 272. But in 2009, we acknowledged that those earlier cases did embody a type of use valuation. *Meijer Stores*, 122 Ohio St.3d 447, 2009-Ohio-3479, 912 N.E.2d 560, at ¶ 24 ("we have also held that the constitutional prohibition does not bar consideration of current-use value in the context of the 'special-purpose property' doctrine").

{¶ 32} The county pins its appeal in this case on applying our *Meijer Stores* opinion from 2009. We hold, however, that *Meijer Stores* has not been shown to be applicable.

### THE SPECIAL-PURPOSE DOCTRINE, WHICH WAS APPLIED IN THE *MEIJER STORES* CASE, HAS NOT BEEN SHOWN TO BE APPLICABLE HERE

{¶ 33} As noted, the county relies on our 2009 *Meijer Stores* opinion, but that reliance is unavailing on this record. In *Meijer Stores*, the competing appraisals formed the basis for determining that the special-purpose doctrine applied, which in turn justified a use valuation of the property. The present case does not present the same kind of evidence at all.

{¶ 34} One crucial element in determining the value of property in the overall market lies in the concept of "highest and best use." "Highest and best use," according to the International Association of Assessing Officers ("IAAO"), "is that use which will generate the highest net return to the property over a reasonable period of time." IAAO, *Property Assessment Valuation* 31 (2d Ed.1996). Valuing a property at its highest and best use means identifying the "reasonably probable and legal use of vacant land or an improved property that is legally permissible, physically possible, appropriately supported, financially feasible, and that *results in the highest value*." (Emphasis added.) Appraisal Institute, *The Appraisal of Real Estate* 278 (13th Ed.2008).

{¶ 35} Highest and best use of the improvements to the land will usually be expressed in terms of the *general type of use* to be made of such property. In this case for example, a "retail store" might be the highest and best use, and since it is currently in that use, the appraisal report might say: "continued use as a retail store." That is in essence what both appraisal reports say in this case. By contrast, in the special-purpose situation one would expect to see: "continued use by the current occupant in its ongoing business."

{¶ 36} *Meijer Stores* illustrates the contrast: because purchasers in the real-estate market might not be able to use the massive facility (a 190,000-square-foot store plus other improvements) just recently built by Meijer to its own particular specifications, the building was not highly marketable—from a cost valuation standpoint, it suffered immediate economic or external obsolescence. And that was how the property owner's appraiser viewed the property. By contrast, the board of education's appraiser performed a type of use valuation by determining "market rent" by positing Meijer as the continuing tenant, and he used build-to-suit properties subject to leases as part of determining what the market rent should be.

{¶ 37} Quite simply, the 11,000-square-foot drugstore at issue in this case is not a likely candidate for special-purpose treatment (compare the 190,000-square-foot store in *Meijer Stores*). Indeed, the appraiser, Hatcher, testified against the applicability of the special-purpose doctrine here, and the record supports his assertion. It follows that the BTA was justified in rejecting the Blosser appraisal.

{¶ 38} In the context of the present record, the county argues that *Meijer Stores* is applicable but ignores a case decided a mere month and a half earlier: *Target Corp. v. Greene Cty. Bd. of Revision*, 122 Ohio St.3d 142, 2009-Ohio-2492, 909 N.E.2d 605. In *Target*, the BTA adopted a value based on the opinion of the owner's appraiser, Lorms—the appraiser whose valuation was rejected in

*Meijer Stores*. In *Target* (in contrast with the *Meijer Stores* case), the county presented no appraisal in support of its higher valuation at the BTA.

{¶ 39} Without evidence of its own, the county in *Target* relied on a two-pronged legal argument. First, that "the BTA should have used data from the first-generation sale prices and rentals rather than second-generation examples." *Target* at ¶ 12. The court affirmed the BTA's rejection of that argument based on the lack of evidence of such first-generation properties.

{¶ 40} Second, the county in *Target* cited our 1996 *Meijer, Inc.* opinion as authority that the type of obsolescence found by the owner's appraiser should not be accepted as valid as a matter of law. This point is directly relevant here: in *Target*, we rejected the county's argument because the result in *Meijer, Inc.* "implicates the special-purpose-property doctrine that we articulated in *Dinner Bell Meats*." Quite simply, the absence of evidence supporting the special-purpose doctrine constituted our reason for affirming the BTA's decision in *Target*.

{¶ 41} This appeal is more akin to *Target* than to *Meijer Stores*. To be sure, the present case does differ from *Target* in that here, the county did present an appraisal—the Blosser appraisal. But the BTA opted to use the competing appraisal for stated reasons, and the Blosser appraisal in the context of the entire record lacks the element that would commend its approach under settled law: namely, there is no finding that the property qualifies for use valuation under the special-purpose doctrine. Moreover, an 11,000-square-foot drugstore is an unlikely candidate for such treatment.

{¶ 42} Because there is no evidentiary basis upon which to apply the special-purpose doctrine and engage in use valuation here, *Meijer Stores* does not supply a legal reason for reversing the BTA's decision.

## CONCLUSION

{¶ 43} For the foregoing reasons, we affirm the decision of the BTA.

Decision affirmed.

O'C<small>ONNOR</small>, C.J., and P<small>FEIFER</small>, O'D<small>ONNELL</small>, L<small>ANZINGER</small>, K<small>ENNEDY</small>, F<small>RENCH</small>, and O'N<small>EILL</small>, JJ., concur.

_____

Stephen Swaim, for appellee.

Rich & Gillis Law Group, L.L.C., Kelley A. Gorry, and James R. Gorry, for appellants.

_____