[Cite as *West Carrollton City Schools Bd. of Edn. v. Montgomery Cty. Bd. of Revision*, 2018-Ohio-2324.]

**IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
MONTGOMERY COUNTY**

| | | |
|---|---|---|
| WEST CARROLLTON CITY SCHOOLS BOARD OF EDUCATION, Appellee | : : : | Appellate Case No. 27686 |
| | : : | BTA Case No. 2015-2319 |
| v. | : : | |
| | : | (Administrative Appeal from Board of |
| MONTGOMERY COUNTY BOARD OF REVISION, Appellee; GOLDEN ARCH LLIMITED PARTNERSHIP, Appellant | : : : : | Tax Appeals) |

. . . . . . . . . . .

O P I N I O N

Rendered on the 15th day of June, 2018.

. . . . . . . . . . .

KAROL C. FOX, Atty. Reg. No. 0041916 and MARK H. GILLIS, Atty. Reg. No. 0066908, 6400 Riverside Drive, Suite D, Dublin, Ohio 43017
    Attorney for Plaintiff-Appellee

CHARLES L. BLUESTONE, Atty. Reg. No. 0060897 and PATRICK J. HEERY, Atty. Reg. No. 0092060, 141 E. Town Street, Suite 100, Columbus, Ohio 43215
    Attorneys for Defendant-Appellant, Golden Arch Limited Partnership

. . . . . . . . . . . . .

HALL, J.

{¶ 1} Golden Arch Limited Partnership, d/b/a Delaware Golden Arch Limited Partnership, appeals from the decision of the Board of Tax Appeals (BTA) that found the taxable value of Golden Arch's property to be $1,340,000 for tax year 2014. We find no error in the BTA's decision, so it is affirmed.

## I. Background

{¶ 2} The property at issue is a 1.457-acre parcel located at 2757 W. Alex Bell Road in Moraine, Ohio. The property is improved with a 4,411-square foot building, constructed in 1996, that houses a McDonald's restaurant. For tax year 2014 the Montgomery County Auditor valued the property at $942,280. Golden Arch filed a complaint with the Board of Revision (BOR) seeking to reduce the value to $661,650. The West Carrollton City Schools Board of Education (BOE) filed a countercomplaint, asking the BOR to retain the auditor's original valuation.

{¶ 3} The BOR held a hearing. Stephen J. Weis, a certified appraiser retained by Golden Arch, testified at the hearing and submitted a written appraisal report. He appraised the property at $645,000 as of January 1, 2014. Golden Arch amended its complaint to conform with Weis's appraisal. The BOE cross-examined Weis but did not present any evidence of its own. The BOR reduced the property's value to $645,000. The BOE appealed to the BTA.

{¶ 4} At the BTA hearing, the BOE presented the testimony and written appraisal report of Thomas D. Sprout, a certified appraiser. Sprout valued the property at $1,340,000.[1] Apparently, the recording device used at the BOR hearing stopped

---

[1] As the BTA noted in its decision, it "held a consolidated merit hearing on this matter, as

recording during Weis's cross-examination. Golden Arch asked the BTA to supplement the record by having Weis recreate the cross-examination portion of his testimony. The BTA agreed and held another hearing at which Weis was cross-examined on his appraisal.

**{¶ 5}** The BTA issued a written decision finding Sprout's analysis superior to Weis's, and the BTA adopted the $1,340,000 valuation proposed by the BOE.

**{¶ 6}** Golden Arch appealed.

## II. Analysis

**{¶ 7}** Golden Arch presents seven assignments of error. Each assignment of error challenges the BTA's assessment of the competing appraisal reports, the specific calculations contained in them, or the relative qualifications of the appraisers.

### First Assignment of Error

The Board of Tax Appeals acted unreasonably and unlawfully, and abused its discretion, when it failed to find that Appellant's appraisal evidence constituted competent and probative evidence of the market value of the subject property.

### Second Assignment of Error

The Board of Tax Appeals acted unreasonably and unlawfully, and abused its discretion, when it failed to find that Appellant met its burden of proof, when the record contained reliable and probative evidence to support

---

well as another matter involving a McDonald's restaurant (BTA No. 2015-2357), which involved the same counsel, same appraisers and substantially the same appraisal reports. (The cases were not formally consolidated because they involved unaffiliated property owners.)" The other case is the subject of a separate appeal (Appellate Case No. 27679).

Appellant's market value of the subject property.

## Third Assignment of Error

The Board of Tax Appeals acted unreasonably and unlawfully, and abused its discretion, by finding the appraisal analysis submitted by Appellee West Carrollton City Schools Board of Education to be more competent and probative evidence of the subject property's market value than the appraisal analysis proffered by Appellant.[2]

## Fourth Assignment of Error

The Board of Tax Appeals acted unreasonably and unlawfully, and abused its discretion, by finding the highest and best use analysis advanced by Appellee West Carrollton City Schools Board of Education more appropriate than the analysis proffered by Appellant.

## Fifth Assignment of Error

The Board of Tax Appeals acted unreasonably and unlawfully, and abused its discretion, in considering the present use of the subject property in determining its market value.

## Sixth Assignment of Error

The Board of Tax Appeals acted unreasonably and unlawfully, and abused its discretion, in finding the capitalization rate advanced by Appellee West

---

[2] The third assignment of error is found only in Golden Arch's notice of appeal. The only mention of the third assignment of error in Golden Arch's merit brief is a parenthetical statement at the end of the argument supporting the first two assignments of error saying that we need not rule on the third assignment of error if we agree with the first two assignments of error. Although we may disregard it because Golden Arch failed to argue it separately, *see* App.R.12(A)(2), our review covers the issue that the assignment of error appears to raise.

Carrollton City Schools Board of Education, rather than the rate adopted by Appellant, more appropriate to use in calculating the subject property's market value under the income capitalization approach to value.

**Seventh Assignment of Error**

The Board of Tax Appeals acted unreasonably and unlawfully, and abused its discretion, in continuing to recognize Appellee West Carrollton City School Board of Education's appraiser as an expert witness in view of the testimony and evidence proffered at the BTA hearing.

**{¶ 8}** Golden Arch's primary argument on appeal is that the BTA should have adopted Weis's valuation. We begin by reviewing the standards that apply to BTA decisions.

A. *Standards of review*

**{¶ 9}** When a case is appealed to the BTA from a board of revision, the appellant has the burden of proving its right to a decrease or increase in value from the value found by the board of revision. *Shinkle v. Ashtabula Cty. Bd. of Revision*, 135 Ohio St.3d 227, 2013-Ohio-397, 985 N.E.2d 1243, ¶ 24. This means that the "appellant must come forward and demonstrate that the value it advocates is a correct value. Once competent and probative evidence of value is presented by the appellant, the appellee who opposes that valuation has the opportunity to challenge it through cross-examination or by evidence of another value." (Citation omitted.) *EOP-BP Tower, L.L.C. v. Cuyahoga Cty. Bd. of Revision*, 106 Ohio St.3d 1, 2005-Ohio-3096, 829 N.E.2d 686, ¶ 6.

**{¶ 10}** The BTA, itself, as a taxing authority, has an independent duty to weigh evidence and make findings, and the BTA reviews the administrative decisions of boards

of revision de novo as to both fact and law. *MacDonald v. Shaker Hts. Bd. of Income Tax Rev.*, 144 Ohio St.3d 105, 2015-Ohio-3290, 41 N.E.3d 376, ¶ 21; *Coventry Towers, Inc. v. City of Strongsville*, 18 Ohio St.3d 120, 122, 480 N.E.2d 412 (1985). Under R.C. 5717.01, the BTA has "three options when hearing an appeal: the board may confine itself to the record and the evidence certified to it by the board of revision, hear additional evidence from the parties, or may make such other investigation of the property as is deemed proper." *Coventry Towers* at 122.

{¶ 11} Under what is called the *Bedford* rule, " 'when the board of revision has reduced the value of the property based on the owner's evidence, that value has been held to eclipse the auditor's original valuation,' and the board of education as the appellant before the BTA may not rely on the latter as a default valuation." *Dublin City Schools Bd. of Edn. v. Franklin Cty. Bd. of Revision*, 147 Ohio St.3d 38, 2016-Ohio-3025, 59 N.E.3d 1270, ¶ 6, referencing *Bedford Bd. of Edn. v. Cuyahoga Cty. Bd. of Revision*, 115 Ohio St.3d 449, 2007-Ohio-5237, 875 N.E.2d 913. (Other citation omitted.) Thus, when the board of revision adopts a new value based on an owner's evidence, the burden of going forward shifts to the board of education on appeal to the BTA. *Id.* The board of education then has the burden to establish a new value, whether that be the valuation of the auditor or another value. *Id.* at ¶ 7.

{¶ 12} With respect to our review of BTA decisions, we note that Golden Arch's notice of appeal was filed before the effective date of recent amendments to R.C. 5717.04, which became effective on September 29, 2017. *See* Am. Sub. H.B. 49, 2017 Ohio Laws File 14. Before the amendments, parties had the option of appealing decisions of the BTA to the Supreme Court of Ohio, as well as to the court of appeals for the county

in which the taxed property was situated. But the statute was amended to eliminate initial appeals to the Supreme Court of Ohio, and the court of appeals in which a notice of appeal has been filed now has exclusive jurisdiction.[3] *See* Am. Sub. H.B. 49, 2017 Ohio Laws File 14, Part 15.

{¶ **13**} R.C. 5717.04, as amended, states:

If upon hearing and consideration of such record and evidence the applicable court decides that the decision of the board appealed from is reasonable and lawful it shall affirm the same, but if the court decides that such decision of the board is unreasonable or unlawful, the court shall reverse and vacate the decision or modify it and enter final judgment in accordance with such modification.[4]

{¶ **14**} The general standards for reviewing BTA decisions are well settled. If the BTA's decision is both "reasonable and lawful," the reviewing court must affirm. *NWD 300 Spring, L.L.C. v. Franklin Cty. Bd. of Revision*, 151 Ohio St.3d 193, 2017-Ohio-7579, 87 N.E.3d 199, ¶ 13, citing R.C. 5717.04. Nonetheless, a reviewing court does not hesitate

---

[3] An exception was made for appeals in which a party files a petition requesting a transfer of jurisdiction to the Supreme Court of Ohio. The petition must be filed within 30 days after the notice of appeal has been filed with the appropriate court of appeals, and the petition must be filed with the Supreme Court of Ohio. If the appeal "involves a substantial constitutional question or a question of great general or public interest," the Supreme Court of Ohio may approve the petition and order the appeal to be taken directly to the Supreme Court. However, if jurisdiction is not transferred, the appeal proceeds in the court of appeals. See R.C. 5717.04, as amended in 2017. The remainder of the amendments to R.C. 5717.04 are non-substantive, except for a line that was added which stated that "[a]s used in this section, 'taxpayer' includes any person required to return any property for taxation."

[4] The amendment to this paragraph is non-substantive, as the only change under the 2017 revision was the insertion of the word "applicable." Am. Sub. H.B. 49, 2017 Ohio Laws File 14, Part 15. Thus, the standard of review is unchanged.

to reverse BTA decisions that are based on incorrect legal conclusions. *See, e.g., Satullo v. Wilkins*, 111 Ohio St.3d 399, 2006-Ohio-5856, 856 N.E.2d 954, ¶ 14, citing *Gahanna-Jefferson Local School Dist. Bd. of Edn. v. Zaino*, 93 Ohio St.3d 231, 232, 754 N.E.2d 789 (2001). Consequently, questions of law are reviewed de novo. *Dublin City Schools Bd. of Edn. v. Franklin Cty. Bd. of Revision*, 139 Ohio St.3d 193, 2013-Ohio-4543, 11 N.E.3d 206, ¶ 13; *Terraza 8, L.L.C. v. Franklin Cty. Bd. of Revision*, 150 Ohio St.3d 527, 2017-Ohio-4415, 83 N.E.3d 916, ¶ 7.

{¶ 15} Review of BTA decisions "is guided by the premise that ' "[t]he fair market value of property for tax purposes is a question of fact, the determination of which is primarily within the province of the taxing authorities." ' " *NWD 300 Spring* at ¶ 13, quoting *EOP-BP Tower*, 106 Ohio St.3d 1, 2005-Ohio-3096, 829 N.E.2d 686, at ¶ 17. (Other citation omitted.) The BTA's factual decisions are upheld "if the record contains reliable and probative evidence supporting the BTA's determination." *Dublin City Schools Bd. of Edn.*, 139 Ohio St.3d 193, 2013-Ohio-4543, 11 N.E.3d 206, at ¶ 13, citing *Satullo* at ¶ 14. Deference is also given to BTA findings about the weight of the evidence, as long as the findings are supported by the record. *Terraza 8* at ¶ 7, citing *Olmsted Falls Bd. of Edn. v. Cuyahoga Cty. Bd. of Revision*, 122 Ohio St.3d 134, 2009-Ohio-2461, 909 N.E.2d 597, ¶ 27.

{¶ 16} Article XII, Section 2 of the Ohio Constitution requires property to be "taxed by uniform rule according to value." "This provision generally requires a real-property valuation to ascertain 'the *exchange* value' of the property." (Citation omitted; emphasis sic.) *Johnston Coca-Cola Bottling Co. v. Hamilton Cty. Bd. of Revision*, 149 Ohio St.3d 155, 2017-Ohio-870, 73 N.E.3d 503, ¶ 13. As a general rule, "the value or true value in

money of any property is the amount for which that property would sell on the open market by a willing seller to a willing buyer. In essence, the value of property is the amount of money for which it may be exchanged, i.e., the sales price." *State ex rel. Park Inv. Co. v. Bd. of Tax Appeals*, 175 Ohio St. 410, 412, 195 N.E.2d 908 (1964). Actual sales are the best way to determine value, when they are available. (Citations omitted.) *Terraza 8*, 150 Ohio St.3d 527, 2017-Ohio-4415, 83 N.E.3d 916, at ¶ 9.

{¶ 17} But where no recent sales of the property have occurred, the BTA has wide latitude in the matters that it can consider and broad discretion in the weight that it attaches to expert testimony. (Citations omitted.) *Wynwood Apts., Inc. v. Bd. of Revision of Cuyahoga Cty.*, 59 Ohio St.2d 34, 35, 391 N.E.2d 346 (1979). When the BTA reviews appraisals, it " 'is vested with wide discretion in determining the weight to be given to the evidence and the credibility of the witnesses that come before it.' " *NWD 300 Spring*, 151 Ohio St.3d 193, 2017-Ohio-7579, 87 N.E.3d 199, at ¶ 13, quoting *EOP-BP Tower*, 106 Ohio St.3d 1, 2005-Ohio-3096, 829 N.E.2d 686, at ¶ 9. (Other citation omitted). Reviewing courts also apply an abuse of discretion standard to BTA decisions on witness credibility and the weight their testimony is given. *Id*. at ¶ 14. An abuse of discretion refers to "an unreasonable, arbitrary, or unconscionable attitude." *Renacci v. Testa*, 148 Ohio St.3d 470, 2016-Ohio-3394, 71 N.E.3d 962, ¶ 32, citing *J.M. Smucker, L.L.C. v. Levin*, 113 Ohio St.3d 337, 2007-Ohio-2073, 865 N.E.2d 866, ¶ 16. BTA factual determinations are not disturbed " ' "if the record contains reliable and probative support." ' " *Meijer Stores Ltd. Partnership v. Franklin Cty. Bd. of Revision*, 122 Ohio St.3d 447, 2009-Ohio-3479, 912 N.E.2d 560, ¶ 17, quoting *Satullo*, 111 Ohio St.3d 399, 2006-Ohio-5856, 856 N.E.2d 954, at ¶ 14, quoting *Am. Natl. Can Co. v. Tracy*, 72 Ohio St.3d 150, 152, 648 N.E.2d 483

(1995).

{¶ 18} Here, the BTA weighed the probative value of two appraisals and found one to be more probative than the other. "This decision rests within the core of the BTA's competence as fact-finder and deserves the highest degree of deference from this court." *Meijer* at ¶ 18. Most of the assignments of error allege deficiencies in Sprout's appraisal and testimony. "But determining the probative value of an appraiser's testimony lies within the competence of the BTA," *id.* at ¶ 20, and we will defer to the BTA's determinations as to these matters.

B. *The competing appraisals and the BTA's findings*

{¶ 19} Each expert—Stephen Weis for Golden Arch and Thomas Sprout for the BOE—performed a comprehensive valuation of the subject property, a McDonald's restaurant. They both valued the property at its "highest and best use," a concept that is a "crucial element in determining the value of property in the overall market." *Rite Aid of Ohio, Inc. v. Washington Cty. Bd. of Revision*, 146 Ohio St.3d 173, 2016-Ohio-371, 54 N.E.3d 1177, ¶ 34. "Highest and best use" " 'is that use which will generate the highest net return to the property over a reasonable period of time.' " *Id.*, quoting IAAO, *Property Assessment Valuation* 31 (2d Ed.1996) (International Association of Assessing Officers).

{¶ 20} Both experts also analyzed the property's value using the same two approaches—the sales-comparison approach and the income-capitalization approach. These different and independent approaches are "two accepted methods of analysis." *Johnston Coca-Cola Bottling Co.,* 149 Ohio St.3d 155, 2017-Ohio-870, 73 N.E.3d 503, ¶ 15. The sales-comparison approach values the subject property by comparing it with similar, or comparable, properties that have recently sold and that reflect the subject

property's market value. The sale price of each comparable property is adjusted for factors like market conditions at the time of sale, building size, location, and quality and condition. Based on the adjusted sales prices, a market price for the subject property is determined. In the income-capitalization approach, the value of the subject property is the present worth of anticipated future income derived from the property. This is calculated by estimating the property's net annual operating income and then applying a rate of capitalization that reflects the relative certainty of continuing to earn that income and the risks of ownership. The net operating income is based on the lease rates of comparable properties. And the appropriate capitalization rate is determined by looking at the capitalization rates of similar properties. Because the purpose of the valuation here is to determine the value for tax purposes, both experts also conducted a tax additur analysis. This analysis removes real estate taxes from the net-operating-income calculation and adds a tax additur to the capitalization rate "to reflect the percentage amount of the subject's value that is paid in tax each year." (Sprout Appraisal Report, p. 46; *see also* Weis Appraisal Report, p. 45-46).[5] After the experts analyzed the property's value under each approach, they reconciled the two values into a final opinion of value.

i. Weis's appraisal

{¶ 21} Weis concluded that the best-and-highest use of the subject property here,

---

[5] A "tax additur" is a component of the capitalization rate that accounts for the negative effect that property taxes have on the value of the property. When the amount of real estate taxes is unknown, such as when the taxes are in dispute, the appraiser develops an adjustment—a "tax additur"—that reflects the "effective tax rate" for the subject property; this percentage then is added to and becomes a component of the capitalization rate. *Columbus City Schools Bd. of Edn. v. Franklin Cty. Bd. of Revision*, 144 Ohio St.3d 324, 2015-Ohio-3633, 43 N.E.3d 387, ¶ 26-28, citing *Worthington City Schools Bd. of Edn. v. Franklin Cty. Bd. of Revision*, 140 Ohio St.3d 248, 2014-Ohio- 3620, 17 N.E.3d 537, ¶ 8, fn. 2.

as improved, was as a "Restaurant."

**{¶ 22}** In his sales-comparison analysis, Weis selected six properties in Montgomery County that had sold between 2012 and 2015. Five of the properties were restaurants and one was a retail building. Three of the restaurants were fast-food restaurants and two were sit-down. Three of the restaurants were vacant at the time of sale, and the retail building was also vacant at the time of its sale. After making adjustments to the sales prices, Weis derived adjusted values of the comparable properties that ranged from $67.28 to $150.64 per square foot. He then concluded that the market value of the subject property was $145 per square foot. Multiplying this square-footage value by the size of the subject property (4,411 sq. ft.) showed a rounded market value of $640,000.

**{¶ 23}** For his income-capitalization analysis, Weis selected nine restaurant properties in Montgomery County that were leased between 2012 and 2015. Based on the adjusted lease rates of these properties, Weis determined that the subject property's net annual operating income was $52,891. Weis then determined that the appropriate rate of capitalization was 8.25%. He based this figure on the subject property's size, location, and condition and on the capitalization rates for 32 retail properties in several Ohio counties as well as national capitalization rates. Next, Weis determined that a tax additur of 0.15% would be appropriate. He applied the adjusted capitalization rate to the net annual operating income to get a rounded value of $650,000.

**{¶ 24}** In his reconciliation of values, Weis gave the most weight to the sales-comparison value, "due to abundance of free standing retail building sales." (Weis Appraisal Report, p. 48). Weis concluded that the value of the subject property as of

January 1, 2014, was $645,000.

ii. Sprout's appraisal

**{¶ 25}** Sprout concluded that the highest-and-best use of the property, as improved, was as a "national fast food restaurant," a little narrower than Weis's highest-and-best use conclusion. (Sprout Appraisal Report, p. 19.)

**{¶ 26}** For his sales-comparison analysis, Sprout selected eight properties that had sold in Ohio between 2012 and 2015—three in the Dayton area, one in Cincinnati, one in Springfield, two in the Columbus area, and one in Mansfield. Six of the properties were restaurants, occupied at the time of sale. One of the properties was a vacant former restaurant in a poor location, which Sprout included to illustrate the sale of what the subject property was not. After making adjustments to the sale prices of the properties, Sprout determined that the market value of the subject property ranged from $300 to $325 per square foot. He then multiplied these values by the subject property's square footage (4,411 sq. ft.) to arrive at a rounded value of between $1,325,000 and $1,435,000.

**{¶ 27}** For his income-capitalization analysis, Sprout used eight comparison properties in Ohio—four in the Dayton area, one in Lebanon, one in Springfield, one in Columbus, and one in Mansfield. Based on the adjusted lease prices of the comparable properties, Sprout determined that the net annual operating income of the subject property was $117,891— more than double Weis's income determination. Sprout then concluded that the appropriate capitalization rate was 7.25%. He based this rate on a band-of-investment analysis, the capitalization rates of the comparison properties, and national rates. Sprout then found that a tax additur of 2.98% should be added to the capitalization rate, giving an adjusted capitalization rate of 10.23%. He applied the

adjusted rate to the net operating income to get a rounded value of $1,340,000.

{¶ 28} In his value reconciliation, in contrast to Weis, Sprout gave the most weight to the income-capitalization value. According to Sprout's report, this value gives a better indication of value because "there is an active rental market for properties such as the subject." (Sprout Appraisal Report, p. 47). Sprout concluded that the value of the subject property on January 1, 2014, was $1,340,000, which is also more than double Weis's valuation.

iii. The BTA's decision

{¶ 29} The BTA found Sprout's valuation analysis "to be the most competent and probative evidence of value." It found that his highest-and-best-use conclusion as a national fast-food restaurant is "most appropriate." And it found that Sprout's "selection of comparable properties, under both the sales comparison and income approaches to value, best represented the market in which the subject property would operate." "Sprout," said the BTA, "mostly relied upon comparables that were operating fast-food restaurants and that continued to operate as fast-food restaurants after their transfer." "Weis, on the other hand, relied upon comparables that were dissimilar from the subject property, i.e., 'sit-down' restaurants, at least one property that had been converted to a different use, and vacant properties." The BTA said that this was a "crucial" difference that led Weis to undervalue the property. As for the capitalization rate, the BTA found that Sprout's rate was "reflective of the subject property's most likely use," because it was based on other fast-food restaurants. The BTA criticized Weis's capitalization rate because "it was derived from properties that were dissimilar from the subject properly, i.e., general retail, instead of restaurant or fast-food restaurant properties."

**{¶ 30}** After reviewing the evidence, the BTA concluded that the BOE had satisfied its evidentiary burden on appeal. The BTA determined that the subject property's value as of January 1, 2014, was $1,340,000.

C. *Golden Arch's challenges to the BTA's decision*

**{¶ 31}** Golden Arch takes issue with the BTA's decision, challenging it in five primary ways. Fundamentally, Golden Arch argues that the BTA should not have given the most weight to Sprout's appraisal. Golden Arch also argues that the BTA's highest-and-best-use finding is too narrow and that it improperly considered the property's present use. Golden Arch further argues that Weis's capitalization rate is better supported than the rate used by the BTA. Finally, Golden Arch argues that the BTA should not have recognized Sprout as an expert.

**{¶ 32}** Again, our standard of review: "We must affirm the BTA's decision if it is reasonable and lawful. R.C. 5717.04. In making this determination, we must consider legal issues de novo and defer to findings concerning the weight of evidence so long as they are supported by the record." (Citations omitted.) *Pavilonis v. Cuyahoga Cty. Bd. of Revision*, Slip Opinion No. 2018-Ohio-1480, ¶ 8.

**{¶ 33}** The BTA here considered two competing opinions of value. Although facially they are widely divergent, the analysis leading to each value is well explained in each appraiser's written appraisal report. Many of Golden Arch's arguments urge us to re-weigh the appraisal evidence presented to the BTA and reach a different conclusion. But that is not our role.

i. The weight given Sprout's valuation

**{¶ 34}** Golden Arch challenges the BTA's determination that Sprout's analysis is

entitled to more weight than Weis's analysis. Specifically, Golden Arch disputes the BTA's findings that Sprout used a more appropriate methodology to value the property, that Sprout's selection of comparable properties "best represents the market in which the subject property would operate," and that Sprout's qualitative adjustments are more probative than Weis's qualitative and quantitative adjustments. Golden Arch also argues that the BTA should not have accepted the sales-breakpoint analysis in Sprout's appraisal report. And Golden Arch claims that Sprout's appraisal methodology and analysis produce inconsistent results.

*Selection of comparable properties*

{¶ 35} The appraisal reports and the appraisers' testimony describe the manner in which comparable properties were selected. Determining which appraiser selected the best comparable properties was the crux of the BTA's decision. On the one hand, Weis generally placed a high priority on using properties within Montgomery County, but this limited the number of properties that were similar to the subject property in other ways, such as the specific nature of the restaurant business (fast-food vs. sit-down restaurants), and resulted in the inclusion of one property that was torn down after its sale and used for a completely different purpose. On the other hand, Sprout chose properties from a wider geographical area, which led to more variations in locations, neighborhood, population, and the like, but allowed him to more narrowly focus his comparisons on operating fast-food restaurants.

{¶ 36} Further, although Golden Arch's argument in its brief places great emphasis on "location, location, location," the BTA concluded that comparison of the properties based on other factors was entitled to greater weight than geographical location. On the

whole, the BTA determined that Sprout's comparable properties were more similar to the subject property in characteristics and markets than Weis's comparables, even if they were located in a broader geographical area.

{¶ 37} The BTA gave its reasons for concluding that Sprout's appraisal was entitled to greater weight. The BTA agreed with Sprout's conclusion that the highest-and-best use of the property was as a fast-food restaurant, rather than as a more broadly defined restaurant or as a property that could be put to use for another retail purpose. The BTA found this difference to be "crucial" and concluded that Weis's approach had undervalued the property. Because Sprout had defined the highest-and-best use more narrowly, the BTA, as the finder of fact, was permitted to reasonably conclude that his comparables were more carefully tailored to this particular use.

{¶ 38} The BTA's statement that Sprout's selection of comparable properties "best represented the market in which the subject property would operate" is reasonable if the "market" is defined in this broader sense, rather than as limited to Montgomery County. And we reject Golden Arch's assertion that this statement by the BTA "makes no sense whatsoever" and is "literally impossible."[6]

*Adjustments*

{¶ 39} Golden Arch also asserts that Sprout's analysis is inferior to Weis's because

---

[6] We also reject Golden Arch's assertions that the Sprout report "strangely chose" an appraisal method, that the BTA's decision is "not merely unreasonable, but shocking," that the Sprout testimony "laughably referr[ed]" to certain building features, that the BTA engaged in "[s]loppy reasoning," that Sprout made "outlandish claims," that the BTA's reasoning was "lazy and factually inaccurate," that the BTA failed "to employ common sense and good judgment in evaluating [Sprout's] appraisal report," or that Sprout "magically conclude[d]" a higher value than the BOR.

Sprout's qualitative adjustments to the sales prices of his comparable properties were less reliable than Weis's qualitative and quantitative sales-price adjustments,[7] and because Sprout did not provide market support for his conclusions.

{¶ 40} The BTA has held that "qualitative, rather than quantitative adjustments, are recognized standard appraisal practice." *Insite Wooster, LLC, v. Wayne Cty. Board of Revision*, BTA No. 2014-4149, 2015 WL 11005090, *4 (Sept. 11, 2015), citing *Bd. of Edn. of the Columbus City Schools v. Franklin Cty. Bd. of Revision*, BTA No. 2014-2022, 2015 WL 1048721 (Feb. 27, 2015). Here, the BTA specifically referenced the *Columbus City Schools* decision for this proposition and rejected Golden Arch's criticism of the fact that Sprout used qualitative adjustments as opposed to the quantitative adjustments Weis applied in his report.

{¶ 41} Golden Arch does not explain exactly what it thinks is wrong with Sprout's qualitative adjustments, other than that they were subjective. We disagree that they were subjective. Having reviewed the record in its entirety, we do not find Sprout's adjustments purely subjective. Both experts testified about their process of making adjustments and they applied similar factors, like location, size, and so forth, to adjust the sales prices of the properties. We fail to see how Sprout's adjustments were more unsubstantiated than Weis's.

*Sprout's sales-breakpoint analysis*

{¶ 42} Golden Arch contends that the BTA ignored the problems that Golden Arch raised concerning Sprout's sales-breakpoint analysis. Golden Arch claims that Sprout's income-capitalization approach is "built around some conjectured 'sales breakpoint

---

[7] The BTA described Weis's adjustments only as "quantitative."

analysis,' " which Golden Arch calls "a flawed methodology unsupported by verifiable market research or appraisal industry guidelines that he used to substantiate his income capitalization approach."

{¶ 43} A "sales breakpoint" typically refers to "[t]he amount of gross sales at which percentage rent becomes payable." Baldwin's Ohio Practice Ohio Real Estate Law, Percentage rent, Section 46:12 (December 2017 Update).[8] One Ohio appellate court has said this about a sales-breakpoint provision in a lease: "A percentage rent was an additional amount payable by a retail tenant at the Centre when its annual sales exceeded a level defined in its lease and referred to as a 'breakpoint.' The additional rent due was computed as a percentage of the amount by which the tenant's sales exceeded the breakpoint." *Kenwood Plaza Ltd. Partnership v. State Teachers' Retirement Sys. Bd.*, 1st Dist. Hamilton No. C-000730, 2001 WL 1077939, *9 (Sept. 14, 2001). These explanations agree with the definition that Sprout gave at the BTA hearing that "[a] breakpoint is * * * a percentage of sales." (July 12, 2016, BTA No. 2015-2319, Tr. 31). Using Wendy's restaurants as an example, Sprout said that "[t]hose leases also a lot of times have a percentage rent based on a breakpoint. So if they achieve a sale level that's above that breakpoint, then the lessee is paying percentage rents to the property owner * * *." *Id.* at 17. A sales-breakpoint provision is put in a lease agreement, said Sprout, "because that

---

[8] "Percentage rent" has been explained this way: "Percentage rent is a reflection of the fact that the commercial location in question is so valuable a location that the traffic generated warrants a premium to be computed in accordance with the commercial revenues obtained from business at the site. Percentage rent also gives the landlord certain protections from the effects of inflation, while protecting the tenant from downturns in sales." Baldwin's Ohio Practice Ohio Real Estate Law, Percentage rent, Section 46:12 (December 2017 Update). "Percentage rent is frequently based on gross sales in excess of the amount of gross sales which would yield the base rent when multiplied by the applicable percentage." *Id.*

way if the tenant's doing well with their sales, the landlord is benefitting as well." *Id.* at 32. How sales breakpoints are determined and the significance of their analysis is complex. Indeed, after going through a lengthy explanation for the BTA hearing examiner, Sprout admitted that "it took me a long time to figure that out myself." *Id.* at 33.

**{¶ 44}** Golden Arch did not spend much time challenging Sprout's sales-breakpoint testimony. It asked him whether "a sales breakpoint rent clause [is] much more common in tenant situations where it's a mall or a strip center than a fast food restaurant." (July 16, 2016, BTA No. 2015-2357, Tr. 24). Sprout disagreed and testified that in his experience national fast-food companies use sales-breakpoint provisions in typical restaurant leases, giving Wendy's as an example.

**{¶ 45}** Golden Arch gives no reason why Sprout's sales-breakpoint analysis is such a problem. It may well be that a sales breakpoint increase in rent disadvantages a more successful business because the net operating income is increased, and hence the income-capitalization value of a specific property will be higher. But the BTA heard Sprout's testimony about his sales-breakpoint analysis and heard Golden Arch's attempts to undermine it. We leave it to the BTA's discretion to accord the analysis the weight that it deserves.

*Sprout's inconsistent results*

**{¶ 46}** Golden Arch claims that Sprout's appraisal methodology produced inconsistent results. It cites another case involving a McDonald's restaurant valuation in which both Weis and Sprout participated as appraisers, *Bd. of Edn. of the Brookville Local Schools v. Montgomery Cty. Bd. of Revision*, BTA No. 2016-325, 2017 WL 3034549 (July 6, 2017). In that case, the appraisers valued a McDonald's restaurant that was "at the

end of its economic life" and was slated to be demolished and replaced, and the BTA noted that the restaurant's age "greatly impact[ed]" its value. The BTA relied on Weis's selection of comparable properties, rather than on Sprout's, in determining the value of the property.

{¶ 47} Golden Arch says that the result in the *Brookville* case should lead us to reject Sprout's appraisal in this case. There are flaws in this reasoning, including that each case is factually different, that we do not have the record and evidence from the *Brookville* case, and that the BTA's rejection of the valuation provided by an appraiser in one case does not automatically impugn that appraiser's qualifications or his opinion in another case. Appraisers make judgments based on the facts of each case, and those facts differ. Accordingly, we find no merit to Golden Arch's claim that Sprout's methodology is inconsistent.

### ii. The highest-and-best-use finding

{¶ 48} Golden Arch's next major argument is that the BTA's conclusion as to the property's highest-and-best use is too narrow. Golden Arch says that the BTA effectively valued the property as "special purpose" property.

### *Special-purpose property?*

{¶ 49} Golden Arch focuses much of its argument on the fact that the two appraisers expressed different opinions about whether the W. Alex Bell Road McDonald's restaurant was a special-purpose property. But even though Sprout believed that it could have been treated as such, he did not value the property as special-purpose property. So Sprout's observation that the property could have been classified as a special-purpose property was inconsequential to the BTA's decision. Indeed, the BTA noted in its decision

that "although the property owner faults Sprout's conclusion that the subject property fit the definition of 'special-purpose property,' we find no error there given that he testified that he did not appraise the property as if it were a 'special-purpose property.' "

### Rite Aid

**{¶ 50}** Golden Arch contends that the BTA ignored *Rite Aid of Ohio, Inc., v. Washington Cty. Bd. of Revision*, 146 Ohio St.3d 173, 2016-Ohio-371, 54 N.E.3d 1177. In *Rite Aid*, the BTA adopted the property owner's lower valuation, finding that the county's comparables, "while potentially appropriate," were drawn from an unnecessarily narrow pool of properties. The Ohio Supreme Court agreed. The Court concluded that the county's appraiser had essentially and unjustifiably treated the subject property as a special-use property and that therefore the BTA "was justified in rejecting" the county's appraisal and adopting the property owner's. The Court also criticized the county's argument that properties encumbered by a lease at the time of sale could be compared with unencumbered properties, without adjustment for this difference, "[p]recisely because the lease affects the sale price and value." *Id.* at ¶ 20.

**{¶ 51}** But Sprout's appraisal does not treat the subject property here as special-purpose property, and the appraisal incorporates very specific information about existing leases on comparable properties in determining whether adjustments in value are appropriate. So we see no conflict between *Rite Aid* and the BTA's decision here.

### The BTA's precedent

**{¶ 52}** Golden Arch also claims that the BTA ignored its own precedent. In *NWD 300 Spring, L.L.C v. Franklin Cty. Bd. of Revision*, 151 Ohio St.3d 193, 2017-Ohio-7579, 87 N.E.3d 199, the Ohio Supreme Court affirmed the BTA's valuation of a luxury, high-

rise residential condominium building. Sprout and another appraiser had provided competing appraisals giving different values. In Sprout's analysis, he selected as comparable properties a variety of vacant land parcels designated for mixed-use in the nearby market rather than vacant land parcels designated for residential use (which is what the other appraiser did). The BTA found that Sprout's comparables were more appropriate and reflective of the subject property's market. The BTA commended Sprout for " 'consider[ing] a wider variety of commercial development' " and faulted the other appraiser for " 'utiliz[ing] only sales of properties ultimately developed into apartments.' " *NWD 300 Spring* at ¶ 9, quoting BTA Nos. 2015-106 et al., 2015 WL 11018757, *4 (Dec. 23, 2015). Golden Arch says that the BTA's decision in the present case directly contradicts its decision in *NWD 300 Spring*.

**{¶ 53}** As we have already pointed out, every valuation case is factually different. We do not have the record and evidence from the *NWD 300 Spring* case. The BTA's acceptance of an analysis provided by an appraiser in one case does not mean that the BTA must accept the same analysis in another case. The facts on which an appraiser makes judgments differ in every case. Therefore we find no merit in Golden Arch's claim that the BTA ignored its own precedent.

### iii. Consideration of present use

**{¶ 54}** Golden Arch's next major argument is that the BTA erred by applying the holding in *Johnston Coca-Cola Bottling*, 149 Ohio St.3d 155, 2017-Ohio-870, 73 N.E.3d 503. Golden Arch says that that case involved the valuation of an enormous bottling plant, which is unlike the subject property here.

**{¶ 55}** In *Johnston*, the Ohio Supreme Court reaffirmed that the "present use"

method of evaluation cannot be the basis of valuing real property for tax purposes, because it " 'excludes, among other factors, location and speculative value which comprise market value * * *.' " *Id.* at ¶ 13, quoting *State ex rel. Park Inv. Co. v. Bd. of Tax Appeals*, 32 Ohio St.2d 28, 33, 289 N.E.2d 579 (1972); *Rite Aid* at ¶ 27. Which is not to say that present use must be ignored. Rather, as the Court stressed in *Johnston*, "[a]lthough present use generally cannot be the only measure of value, in a proper case it may be considered in determining true value for tax purposes." *Johnston* at ¶ 14. The key point is that the present-use value may not be considered "to the exclusion of other factors relevant to exchange value." *Id.* at ¶ 15. The *Johnston* court found that the BTA referred to the property's present use as a bottling company but that "it did so in the context of deciding which comparables identified by the appraisers were 'more analogous' under the sales-comparison approach." *Id.* at ¶ 16. This consideration of present use was not improper.

{¶ 56} Here, the BTA observed that Sprout did not value the subject property based solely on its present use as a McDonald's restaurant: "[W]e find that Sprout properly considered the subject property's current use as a McDonald's restaurant and developed the sales comparison and income approaches to value to determine the subject property's exchange value." *Johnston* supports this finding, said the BTA. On this record we cannot disagree.

### iv. The capitalization rate

{¶ 57} Golden Arch argues that the BTA should have chosen Weis's capitalization rate of 8.25% over Sprout's 7.25% rate.

{¶ 58} The BTA faulted Weis's capitalization rate because he derived it from

properties that were unlike the subject property:

> * * * Weis's capitalization rate raises concerns given that it was derived from properties that were dissimilar from the subject properly, i.e., general retail, instead of restaurant or fast-food restaurant properties. As such, we cannot confirm that his capitalization rate appropriately captures the market in which the subject property would operate. However, Sprout's capitalization rate was based upon fast-food restaurants and, therefore, reflective of the subject property's most likely use.

{¶ 59} Both appraisers consulted local and national capitalization rates to derive their respective rates. Sprout looked at seven fast-food restaurants in Ohio, three of which were in the Dayton area. The capitalization rates of these properties ranged from 5.45% to 6.77%. Sprout also consulted the *PwC Real Estate Survey*, "a national publication indicating typical capitalization rates within the net lease market traded in the U.S.," which he included with his report. (Sprout Appraisal Report, p. 45). This survey shows a range of 6.0% and 8.5%. Finally, Sprout conducted a band-of-investment analysis, which showed a range of 6.77% to 7.27%. As for Weis, he looked at 32 properties across Ohio, only ten of which were restaurants and of those ten only nine were fast-food. And like Sprout, Weis consulted a source for national capitalization rates. This source used various techniques to determine the capitalization rate in the retail, restaurants (all types), and restaurants (fast food) sectors.

{¶ 60} Which capitalization rate is more accurate? Who knows. But the evidence supporting Sprout's rate of 7.25% is reliable and probative. And the BTA's decision to adopt this rate as the appropriate capitalization rate for the subject property was

reasonable. *See Dublin City Schools Bd. of Edn.*, 139 Ohio St.3d 193, 2013-Ohio-4543, 11 N.E.3d 206, at ¶ 13; *Terraza 8*, 150 Ohio St.3d 527, 2017-Ohio-4415, 83 N.E.3d 916, at ¶ 7.

### v. Sprout's qualifications as an expert

**{¶ 61}** Finally, Golden Arch argues that the BTA should not have "continu[ed] to recognize" Sprout as an expert. Golden Arch suggests that it discredited or impeached Sprout such that the BTA should have doubted whether Sprout "ha[d] experience in appraising fast-food restaurants" or was "familiar with the neighborhood in which the Subject Property is located."

**{¶ 62}** In its decision, the BTA rejected Golden Arch's argument that Sprout was not an expert:

> We note that, at this board's hearing, the property owner stipulated to Sprout's qualifications as set forth in his appraisal report; however, in its post-hearing briefs, the property owner attempts to impugn Sprout's qualifications and claims that he misled this board about his qualifications. We find no merit to this argument and recognize Sprout (and Weis) as an expert qualified to render an opinion on the subject property's value.

The BTA provided a detailed discussion of how it weighed the experts' opinions and methodology, including specific criticisms of Weis's analysis. Golden Arch obviously disagrees with Sprout's conclusions, but nothing in the record suggests that Sprout was unqualified, that his choice of comparable properties or his calculations were unreasonable, or that his valuation should have been disregarded because he lacked

appropriate qualifications.

### III. Conclusion

**{¶ 63}** The BTA said in its decision that "inherent in the appraisal process is the fact that an appraiser must make a wide variety of subjective judgments" in selecting data on which to rely, making adjustments to the data to make it "usable," and interpreting and evaluating all the information to form an opinion. Similarly, the BTA must use its judgment in determining which evidence presents the most credible valuation. Here, the BTA relied on credible evidence from an appraiser who presented support for his positions. Based on the record before us, we conclude that the BTA's determination was reasonable and lawful.

**{¶ 64}** All of the assignments of error are overruled. The BTA's decision is affirmed.

. . . . . . . . . . . . .

WELBAUM, P.J. and FROELICH, J., concur.

Copies mailed to:

Karol C. Fox
Mark H. Gillis
Charles L. Bluestone
Patrick J. Heery
Laura Mariani
Joseph W. Testa, Ohio Tax Commissioner