[Cite as *Kettering City Schools Bd. of Edn. v. Montgomery Cty. Bd. of Revision*, 2018-Ohio-2325.]

**IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
MONTGOMERY COUNTY**

| | | |
|---|---|---|
| KETTERING CITY SCHOOLS BOARD OF EDUCATION, Appellee | : | |
| | : | |
| | : | Appellate Case No. 27683 |
| v. | : | |
| | : | BTA Case No. 2015-2331 |
| MONTGOMERY COUNTY BOARD OF REVISION, Appellee; GEORGE E. RYNE, Appellant | : | (Administrative Appeal from Board of Tax Appeals) |
| | : | |
| | : | |
| | : | |

. . . . . . . . . .

O P I N I O N

Rendered on the 15th day of June, 2018.

. . . . . . . . . .

KAROL FOX, Atty. Reg. No. 0041916 and MARK GILLIS, Atty. Reg. No. 0066908, 6400 Riverside Drive, Suite D, Dublin, Ohio 43026
    Attorneys for Plaintiff-Appellee Kettering City Schools Board of Education

CHARLES L. BLUESTONE and PATRICK J. HEERY, 141 E. Town Street, Suite 100, Columbus, Ohio 43215
    Attorneys for Defendant-Appellant George E. Ryne

. . . . . . . . . . . . .

FROELICH, J.

**{¶ 1}** George E. Ryne appeals from the Decision and Order of the Ohio Board of Tax Appeals (BTA), which valued a McDonald's restaurant owned by Ryne at $2,055,000 for tax year 2014. For the following reasons, the Decision and Order of the BTA will be affirmed.

### *Background Information*

**{¶ 2}** The property in question, parcel number N64 00803 0245, is located at 2901 Wilmington Pike in Kettering. The Wilmington Pike McDonald's was constructed in 2012, subject to a ground lease. As of January 1, 2014, the Montgomery County Auditor valued the property at $1,402,840. The McDonald's owner, Ryne, filed a complaint with the Board of Revision (BOR) requesting that the value of the property be reassessed at $1,076,200. The Kettering City Schools Board of Education (Kettering BOE) filed a counter-complaint objecting to the requested reduction in value.

**{¶ 3}** The BOR conducted a hearing at which both Ryne and the Kettering BOE participated, but only Ryne presented expert evidence. Specifically, Ryne submitted a report and expert testimony from Stephen J. Weis, who opined that the property should be valued at $1,115,000. Ryne amended his request for the reassessment of the property to reflect this amount. The BOR voted to reduce the value of the subject property to $1,118,870, without explaining why its valuation differed from Weis's. For reasons that are unclear, no record of the BOR hearing was made.

**{¶ 4}** The Kettering BOE appealed to the BTA. (BTA Case No. 2015-2331). Because there was no record of the BOR proceedings and because the parties sought to

supplement the record, the BTA conducted a hearing on October 6, 2016.[1]  At the hearing, Ryne again presented Weis's opinion and his appraisal report in support of a $1,115,000 valuation of the property.  The Kettering BOE presented expert testimony and an appraisal report from Thomas D. Sprout, who opined that the value of the property was $2,055,000 as of January 1, 2014.

{¶ 5}  The BTA adopted the $2,055,000 valuation proposed by the Kettering BOE.

{¶ 6}  Ryne appeals, raising six assignments of error.[2]  Each of these assignments challenges the BTA's assessment of the appraisal reports, the specific calculations contained in them, and/or the relative qualifications of the appraisers.

***Standard of Review***

{¶ 7}  When cases are appealed to the BTA from boards of revision, the appellant has the burden of proving its right to a decrease or increase in value from the value that the board of revision has determined.  (Citations omitted.)  *Shinkle v. Ashtabula Cty. Bd. of Revision*, 135 Ohio St.3d 227, 2013-Ohio-397, 985 N.E.2d 1243, ¶ 24.  This means that "the appellant must come forward and demonstrate that the value it advocates is a correct value.  Once competent and probative evidence of value is presented by the appellant, the appellee who opposes that valuation has the opportunity to challenge it through cross-examination or by evidence of another value."  (Citation omitted.)  *EOP-*

---

[1] The BTA's hearing involved two matters, both involving McDonald's restaurants, the same attorneys, the same appraisers, and "substantially the same appraisal reports" (according to the BTA decision and order), but the cases were not formally consolidated because the properties had different owners.  The other case was BTA Case No. 2015-2328, involving the valuation of a McDonald's on Stroop Road.

[2] Although Ryne numbers his assignments as if there are seven, neither his table of contents nor the text of his brief contains a third assignment.

*BP Tower, L.L.C. v. Cuyahoga Cty. Bd. of Revision*, 106 Ohio St.3d 1, 2005-Ohio-3096, 829 N.E.2d 686, ¶ 6.

{¶ 8} The BTA itself, as a taxing authority, has an independent duty to weigh evidence and make findings, and the BTA reviews the administrative decisions of boards of revision de novo as to both fact and law. *MacDonald v. Shaker Hts. Bd. of Income Tax Rev.*, 144 Ohio St.3d 105, 2015-Ohio-3290, 41 N.E.3d 376, ¶ 21; *Coventry Towers, Inc. v. Strongsville*, 18 Ohio St.3d 120, 122, 480 N.E.2d 412 (1985). Under R.C. 5717.01, the BTA has "three options when hearing an appeal: the board may confine itself to the record and the evidence certified to it by the board of revision, hear additional evidence from the parties, or may make such other investigation of the property as is deemed proper." *Coventry Towers* at 122.

{¶ 9} Under what is called the "*Bedford* rule," " 'when the board of revision has reduced the value of the property based on the owner's evidence, that value has been held to eclipse the auditor's original valuation,' and the board of education as the appellant before the BTA may not rely on the latter as a default valuation." *Dublin City Schools Bd. of Edn. v. Franklin Cty. Bd. of Revision*, 147 Ohio St.3d 38, 2016-Ohio-3025, 59 N.E.3d 1270, ¶ 6, referencing *Bedford Bd. of Edn. v. Cuyahoga Cty. Bd. of Revision*, 115 Ohio St.3d 449, 2007-Ohio-5237, 875 N.E.2d 913. (Other citation omitted.) Thus, when the board of revision adopts a new value based on an owner's evidence, the burden of going forward shifts to the board of education on appeal to the BTA. *Id.* The board of education then has the burden to establish a new value, whether that be the valuation of the auditor or another value. *Id.* at ¶ 7.

{¶ 10} With respect to our review of BTA decisions, we note that Ryne's notice of

appeal was filed before the effective date of recent amendments to R.C. 5717.04, which became effective on September 29, 2017.  *See* Am. Sub. H.B. 49, 2017 Ohio Laws File 14.  Prior to the amendments, parties had the option of appealing decisions of the BTA to the Supreme Court of Ohio, as well as to the court of appeals for the county in which the taxed property was situated.  However, the statute was amended to eliminate initial appeals to the Supreme Court of Ohio, and the court of appeals now has exclusive jurisdiction over such an appeal.[3]  *See* Am. Sub. H.B. 49, 2017 Ohio Laws File 14, Part 15.

{¶ 11} R.C. 5717.04, as amended, states that:

If upon hearing and consideration of such record and evidence the applicable court decides that the decision of the board appealed from is reasonable and lawful it shall affirm the same, but if the court decides that such decision of the board is unreasonable or unlawful, the court shall reverse and vacate the decision or modify it and enter final judgment in accordance with such modification.[4]

---

[3] An exception was made for appeals in which a party files a petition requesting a transfer of jurisdiction to the Supreme Court of Ohio. The petition must be filed within 30 days after the notice of appeal has been filed with the appropriate court of appeals, and the petition must be filed with the Supreme Court of Ohio.  If the appeal "involves a substantial constitutional question or a question of great general or public interest," the Supreme Court of Ohio may approve the petition and order the appeal to be taken directly to the Supreme Court.  However, if jurisdiction is not transferred, the appeal proceeds in the court of appeals.  *See* R.C. 5717.04, as amended in 2017.  The remainder of the amendments to R.C. 5717.04 are non-substantive, except for a line that was added which stated that "[a]s used in this section, 'taxpayer' includes any person required to return any property for taxation."

[4] The amendment to this paragraph is non-substantive, as the only change under the 2017 revision was the insertion of the word "applicable."  Am. Sub. H.B. 49, 2017 Ohio Laws File 14, Part 15.  Thus, the standard of review is unchanged.

{¶ 12} The general standards for reviewing BTA decisions are well settled. If the BTA's decision is both "reasonable and lawful," the reviewing court must affirm. *NWD 300 Spring, L.L.C. v. Franklin Cty. Bd. of Revision*, 151 Ohio St.3d 193, 2017-Ohio-7579, 87 N.E.3d 199, ¶ 13, citing R.C. 5717.04. Nonetheless, a reviewing court does not hesitate to reverse BTA decisions that are based on incorrect legal conclusions. *See, e.g.*, *Satullo v. Wilkins*, 111 Ohio St.3d 399, 2006-Ohio-5856, 856 N.E.2d 954, ¶ 14, citing *Gahanna-Jefferson Local School Dist. Bd. of Edn. v. Zaino*, 93 Ohio St.3d 231, 232, 754 N.E.2d 789 (2001). Consequently, questions of law are reviewed de novo. *Terraza 8, L.L.C. v. Franklin Cty. Bd. of Revision*, 150 Ohio St.3d 527, 2017-Ohio-4415, 83 N.E.3d 916, ¶ 7; *Dublin City Schools Bd. of Edn. v. Franklin Cty. Bd. of Revision*, 139 Ohio St.3d 193, 2013-Ohio-4543, 11 N.E.3d 206, ¶ 13.

{¶ 13} Review of BTA decisions "is guided by the premise that ' "[t]he fair market value of property for tax purposes is a question of fact, the determination of which is primarily within the province of the taxing authorities." ' " *NWD 300 Spring* at ¶ 13, quoting *EOP-BP Tower,* 106 Ohio St.3d 1, 2005-Ohio-3096, 829 N.E.2d 686, at ¶ 17. (Other citation omitted.) The BTA's factual decisions are upheld "if the record contains reliable and probative evidence supporting the BTA's determination." *Dublin City Schools Bd. of Edn.*, 139 Ohio St.3d 193, 2013-Ohio-4543, 11 N.E.3d 206, at ¶ 13, citing *Satullo* at ¶ 14. Deference is also given to BTA findings about the weight of the evidence, as long as the findings are supported by the record. *Terraza 8* at ¶ 7, citing *Olmsted Falls Bd. of Edn. v. Cuyahoga Cty. Bd. of Revision*, 122 Ohio St.3d 134, 2009-Ohio-2461, 909 N.E.2d 597, ¶ 27.

{¶ 14} Article XII, Section 2 of the Ohio Constitution requires property to be "taxed

by uniform rule according to value." "This provision generally requires a real-property valuation to ascertain 'the *exchange* value' of the property." (Citation omitted; emphasis sic.) *Johnston Coca-Cola Bottling Co. v. Hamilton Cty. Bd. of Revision*, 149 Ohio St.3d 155, 2017-Ohio-870, 73 N.E.3d 503, ¶ 13. As a general rule, "the value or true value in money of any property is the amount for which that property would sell on the open market by a willing seller to a willing buyer. In essence, the value of property is the amount of money for which it may be exchanged, i.e., the sales price." *State ex rel. Park Inv. Co. v. Bd. of Tax Appeals*, 175 Ohio St. 410, 412, 195 N.E.2d 908 (1964). Actual sales are the best way to determine value, when they are available. (Citations omitted.) *Terraza 8*, 150 Ohio St.3d 527, 2017-Ohio-4415, 83 N.E.3d 916, at ¶ 9

{¶ 15} However, where no recent sales of the property have occurred, the BTA has wide latitude in the matters it can consider and broad discretion in the weight it can attach to expert testimony. (Citations omitted.) *Wynwood Apts, Inc. v. Bd. of Revision of Cuyahoga Cty.*, 59 Ohio St.2d 34, 35, 391 N.E.2d 346 (1979). When the BTA reviews appraisals, it also " 'is vested with wide discretion in determining the weight to be given to the evidence and the credibility of the witnesses that come before it.' " *NWD 300 Spring*, 151 Ohio St.3d 193, 2017-Ohio-7579, 87 N.E.3d 199, at ¶ 13, quoting *EOP-BP Tower,* 106 Ohio St.3d 1, 2005-Ohio-3096, 829 N.E.2d 686, at ¶ 9. (Other citation omitted). Reviewing courts also apply an abuse of discretion standard to BTA decisions on witness credibility and the weight their testimony is given. *Id.* at ¶ 14. An abuse of discretion refers to "an unreasonable, arbitrary, or unconscionable attitude." *Renacci v. Testa*, 148 Ohio St.3d 470, 2016-Ohio-3394, 71 N.E.3d 962, ¶ 32, citing *J.M. Smucker, L.L.C. v. Levin,* 113 Ohio St.3d 337, 2007-Ohio-2073, 865 N.E.2d 866, ¶ 16.

*The Evidence Presented at the BTA Hearing*

**{¶ 16}** Ryne and the Kettering BOE presented expert appraisers at the BTA hearing. Ryne's expert was Stephen J. Weis, and the Kettering BOE's expert was Thomas D. Sprout. Both experts used the sales comparison and income capitalization methods in valuing the property, and both concluded that the property's highest and best use was as a restaurant. However, Weis defined the highest and best use as a restaurant, generally, whereas Sprout concluded that the highest and best use was specifically as a fast-food restaurant.

**{¶ 17}** Using the sales comparison approach, Weis compared the Wilmington Pike McDonald's to six other restaurant properties in Montgomery County which he found to be comparable and which had been sold between 2013 and 2015. Three of these were sit-down restaurants (Applebee's, Bob Evans, and Longhorn Steakhouse) and one was a Subway with no drive-thru; the other two were fast-food restaurants (KFC and Burger King) that were no longer in operation. After adjusting for superior or inferior characteristics of the various properties, such as location, size, ease of access, and age of the building, Weis arrived at a price-per-square-foot for each comparable property. He concluded that the Wilmington Pike McDonald's should be valued at $215 per square foot as of January 1, 2014. Using this number, the sales comparison value of the Wilmington Pike McDonald's was $1,100,000 (5,118 sq. ft. at $215 per sq. ft. = $1,100,370, rounded to $1,100,000).[5,6]

---

[5] The valuations discussed by the appraisers in this case were rounded to the nearest thousandth or ten-thousandth.

[6] We note that the parties' calculations use different square footages for the Wilmington Pike McDonald's. Weis's calculations are based on 5,118 sq. ft., an area based on his

{¶ 18} Weis also valued the property using the income capitalization approach. He described the steps of this process, generally, as follows: 1) determining the effective gross income of the property by analyzing the potential gross income of the property and its occupancy level; 2) deducting actual or estimated operating expenses from the effective gross income to determine the net operating income; and 3) capitalizing the net operating income by an appropriate rate reflecting the "risk and return characteristics for [the] type of investment," to arrive at an estimate of the property's value.

{¶ 19} Weis considered numerous properties and their market-derived capitalization rates in determining a capitalization rate for the Wilmington Pike McDonald's. These properties included other fast-food restaurants (but no McDonald's), as well as other types of retail, such as drug, hardware, cellular phone, and pet stores, a dollar store, and a medical office; Weis also considered some secondary sources of capitalization rates. For the Wilmington Pike McDonald's, Weis determined that the direct capitalization rate was 8% and that the rate using a tax additur analysis[7] was 8.17%. Using a net operating income of $91,303, capitalized at a rate of 8.17%, Weis

own on-site measurements and a survey provided to him by the restaurant. Sprout's calculations are based on an area of 5,318 sq. ft., "per County Auditor."

[7] A "tax additur" is a component of the capitalization rate that accounts for the negative effect that property taxes have on the value of the property. When the amount of real estate taxes is unknown, such as when the taxes are in dispute, the appraiser develops an adjustment – a "tax additur"– that reflects the "effective tax rate" for the subject property; this percentage then is added to and becomes a component of the capitalization rate. *Columbus City Schools Bd. of Edn. v. Franklin Cty. Bd. of Revision*, 144 Ohio St.3d 324, 2015-Ohio-3633, 43 N.E.3d 387, ¶ 26-28, citing *Worthington City Schools Bd. of Edn. v. Franklin Cty. Bd. of Revision,* 140 Ohio St.3d 248, 2014-Ohio-3620, 17 N.E.3d 537, ¶ 8, fn. 2.

concluded that the value of the McDonald's under this method was $1,120,000 ($91,303 / .0817 = $1,117,539.78, rounded to $1,120,000).

{¶ 20} In reconciling his two valuations, Weis gave greater weight to the sales comparison method "due to the abundance of free standing retail building sales." Accordingly, he concluded that the value of the Wilmington Pike McDonald's on January 1, 2014, was $1,115,000.

{¶ 21} Like Weis, Sprout, the Kettering BOE appraiser, examined various characteristics of the Wilmington Pike McDonald's, including its physical characteristics, its location, the availability of other properties in the vicinity, and the stability of the neighborhood, in conducting his sales comparison analysis. Sprout used seven restaurant properties for comparison; two were in Montgomery County and five were in other Ohio counties. These properties had been sold between 2012 and 2015, and Sprout testified as to whether each was analyzed for superior or inferior characteristics to the Wilmington Pike McDonald's. Five were operating fast-food restaurants. Based on comparisons to the sales of these properties, Sprout concluded that the sales comparison value of the Wilmington Pike McDonald's on January 1, 2014 was between $2,020,000 and $2,150,000 (5,381 sq. ft. at $375 or $400 per sq. ft. = $2,017,875 or $2,152,400, rounded to $2,020,000 and $2,150,000, respectively).

{¶ 22} Using the income capitalization method and procedures similar to those described by Weis, Sprout compared eight properties with the Wilmington Pike McDonald's. Six were occupied by fast-food restaurants (Wendy's, Chipotle, Arby's, Steak & Shake), and two were vacant but previously occupied by fast-food restaurants (Taco Bell and Krispy Kreme). Many of the restaurants had drive-thrus, and Sprout

discussed the importance of this feature to a fast-food restaurant, where "well over 50 percent" of sales, and perhaps as much as 70 percent, comes from the drive-thru. Sprout distinguished Chipotle restaurants, which do not have drive-thrus but which he nonetheless characterized as fast-food restaurants and used in his comparisons; he explained that Chipotle was an "exception to the rule" because of its "food concept," where "you walk through the line in order to tell them what you want on your burrito or your bowl or whatever." Sprout was critical of Weis's comparisons because some were not fast-food restaurants.

{¶ 23} Based on his estimates of the Wilmington Pike McDonald's sales and expenses, Sprout determined that its net operating income was $214,583. (Sprout also testified that the unwillingness of the Wilmington Pike McDonald's to provide him with specific sales and lease information to use in his calculations caused him to assume "that the sales must have been higher than what my indications were.") Sprout arrived at a base capitalization rate of 7%, but using the tax additur he estimated the capitalization rate to be 10.44%. Therefore, he estimated the income capitalization value for the property at $2,055,000 ($214,583 / .1044 = $2,055,392.72, rounded to $2,055,000).

{¶ 24} In reconciling his two valuations, Sprout noted in his report that both values were based "on good quality data," but that the "income approach" provided the "primary indication of value," considering the active rental market for such properties. Therefore, he valued the property at $2,055,000 as of January 1, 2014.

{¶ 25} When Sprout was questioned about why he used some properties in his comparisons that were outside of Montgomery County, rather than certain properties within the county, he provided specific reasons for the exclusions. For example, Sprout

stated that he did not use a former Burger King because it was a "land sale" and "improper to use" because the buyer intended to tear down the building and erect a different one with a non-restaurant use (a tire store). Sprout also testified that he excluded the sales of several Wendy's restaurants in Montgomery County from his comparisons because they were part of a "bulk purchase of multiple Wendy's throughout the Midwest." Sprout criticized Weis for including sit-down restaurants in his comparisons of rental value, commenting that the design of a fast-food restaurant is largely based on the importance of the drive-thru and that, in his opinion, such properties are not comparable without appropriate adjustments related to the type of service.

{¶ 26} Weis was recalled at the hearing to rebut Sprout's testimony and conclusions. Weis asserted that Sprout made contradictory statements about whether the property was "special-use property" or could accommodate various restaurant uses, but then compared it to properties in the market more generally. Weis was also critical of Sprout's focus on drive-thrus, stating that several of Sprout's comparables did not have drive-thrus (the Chipotle restaurants), that it is "not a big deal," and that drive-thrus present a "trade-off" because they take up parking spaces. Weis also emphasized that, in his opinion, use of properties "outside the market," as opposed to local sales, and other bases for Sprout's calculations made Sprout's analysis less reliable than Weis's.

### BTA Findings

{¶ 27} The BTA found that Sprout's highest and best use analysis was "most appropriate," based on his determination that the property was "most suitable for continued use consistent with the original purpose as a national fast-food restaurant." The BTA noted that Sprout did not view the property so narrowly as to limit it to a single

user, but did define its use more narrowly than simply a "restaurant." The BTA also noted that Sprout did not appraise the property as if it were a "special-purpose property," although he observed that it could have fit that definition, and thus that Weis's and Ryne's criticism of Sprout's conclusion that the property could have been treated as a special-purpose property was of no consequence.

{¶ 28} The BTA also found that, with respect to both the sales comparisons and the income capitalization comparisons, Sprout's "selection of comparable properties * * * best represented the market in which the subject property would operate." Specifically, the BTA favored Sprout's use of comparables that operated as fast-food restaurants both before and after their transfers. It found that Weis's comparisons to "dissimilar" properties, including sit-down restaurants, vacant properties, and at least one property that had been converted to a different use, led to an undervaluation of the subject property.

{¶ 29} With respect to the locations of the comparable properties used in the valuations, the BTA found "it was appropriate to select comparable properties in other Ohio counties that were more similar to the subject property, which Sprout did, [rather] than to select dissimilar properties located within Montgomery County, which Weis did." Similarly, with respect to the appraisers' determinations of capitalization rates, the BTA concluded that, because Weis used dissimilar properties from the subject property, the BTA could not "confirm that his capitalization rate appropriately captures the market in which the subject property would operate," whereas Sprout's capitalization rate, because it was based on fast-food restaurants, reflected the property's "most likely use."

{¶ 30} The BTA was critical of both appraisers for failing to develop "the cost

approach to value." The BTA noted that the Wilmington Pike McDonald's building was only approximately 18 months old on January 1, 2014, and that, with new or relatively new construction, "the cost approach is particularly relevant." Although Weis's report contained some information about construction costs, the BTA concluded that the information was insufficient for the BTA to rely upon it, because some probative market factors were not included. The BTA's decision was critical of Ryne's attempt to impugn Sprout's qualifications at the hearing, finding that this argument was without merit.

{¶ 31} Based on its independent weighing of the evidence presented, the BTA found that the Kettering BOE had "satisfied its evidentiary burden on appeal" and that its appraisal evidence, as presented by Sprout, "was the most competent and probative evidence of the subject property's value" as of January 1, 2014. It therefore adopted Sprout's appraisal value of $2,055,000 as the true value of the Wilmington Pike McDonald's.

{¶ 32} Ryne appeals from the decision of the BTA, pursuant to R.C. 5717.04.

*Arguments on Appeal*

{¶ 33} Ryne argues that Weis's methodology for valuing the property was more appropriate than Sprout's, that Sprout improperly concluded that the property was a "special purpose" property without identifying any unique characteristics, that Sprout's conclusions were "inconsistent," and that it made no sense for the BTA to conclude that the comparable properties identified and relied upon by Sprout best represented "the market in which the subject property would operate," because he did not limit himself to Montgomery County.

{¶ 34} As discussed above, we review questions of law de novo, but we recognize

that the fair market value of a property for tax purposes is a question of fact, on which we defer to the taxing authorities. *NWD 300 Spring,* 151 Ohio St.3d 193, 2017-Ohio-7579, 87 N.E.3d 199, at ¶ 13, quoting *EOP-BP Tower,* 106 Ohio St.3d 1, 2005-Ohio-3096, 829 N.E.2d 686, at ¶ 17.   An appellate court will not disturb a decision of the BTA with respect to valuation if its decision is both "reasonable and lawful."   *Id.*   If the record contains reliable and probative evidence supporting the BTA's factual determinations, we must uphold its decision.   *Dublin City Schools Bd. of Edn.*, 139 Ohio St.3d 193, 2013-Ohio-4543, 11 N.E.3d 206, at ¶ 13, citing *Satullo* at ¶ 14; *Terraza 8,* 150 Ohio St.3d 527, 2017-Ohio-4415, 83 N.E.3d 916, at ¶ 7, citing *Olmsted Falls Bd. of Edn.*, 122 Ohio St.3d 134, 2009-Ohio-2461, 909 N.E.2d 597, at ¶ 27.

{¶ 35}   Many of Ryne's arguments urge us to engage in our own weighing of the evidence presented to the BTA and, presumably, to reach a different result.   This is not our proper role, and we decline to do so.   The BTA considered two opinions as to valuation, and each appraiser documented his methodology.   Of particular consequence, the reports and the appraisers' testimonies described the manner in which comparable properties were selected.   Determining which appraiser selected the best comparable properties was the crux of the BTA's decision.   On the one hand, Weis generally placed a high priority on using properties within Montgomery County, but this limited the number of properties that were similar to the Wilmington Pike McDonald's in other ways, such as the specific nature of the restaurant business (fast-food vs. sit-down restaurants), and resulted in the inclusion of one property that was torn down after its sale and used for a completely different purpose (a tire store).   On the other hand, Sprout chose properties from a wider geographical area, which led to some variations in

neighborhood, population, and the like, but allowed him to more narrowly focus his comparisons on operating fast-food restaurants.

{¶ 36} The BTA stated its reasons for concluding that Sprout's appraisal was entitled to greater weight. The BTA agreed with Sprout's conclusion that the highest and best use of the property was as a fast-food restaurant, rather than as a more-broadly-defined restaurant or as a property that could be put to use for another retail purpose. The BTA found this difference to be "crucial" and concluded that Weis's approach had undervalued the property. Because Sprout had defined the highest and best use more narrowly, the BTA, as the finder of fact, reasonably concluded that his comparables were more carefully tailored to this particular use.

{¶ 37} Ryne also criticizes Sprout's capitalization rates, arguing that "the strong creditworthiness of the tenant[s] heavily exerted downward pressure on the cap rate" for some of the sales, thus increasing their value. Weis testified at the hearing that McDonald's restaurants "have actually one of the highest credits in the market for restaurants," and Sprout testified that "McDonald's is the gold standard from the standpoint of an investment company." But no McDonald's were used in the comparisons of either appraiser. Of the seven comparable properties Sprout used in calculating his capitalization rate, four were either Wendy's, a longstanding national chain, or Chipotle. Moreover, there was testimony at the hearing about Chipotle's very rapid growth rate compared to McDonald's, and that the Chipotle sales used in Sprout's calculations preceded the listeria outbreaks at a few Chipotle restaurants, which might have negatively affected its financial outlook. The capitalization rates of the comparable properties used by Sprout ranged from 6% to 6.77%. Further, Sprout testified that he

had consulted a national publication which states the "typical capitalization rates within the net lease market"; this source indicated a capitalization rate of between 6% and 8.5% in the first quarter of 2014, with an average of 7.03%. Sprout used a capitalization rate of 7% (prior to adjustment for tax additur). Based on the evidence presented, it was not unreasonable or unlawful for the BTA to conclude that Sprout's capitalization rate was based on sound calculations.

{¶ 38} Further, although Ryne's argument in his brief places great emphasis on "location, location, location," the BTA concluded that comparison of the properties based on other factors was entitled to greater weight than geographical location. On the whole, the BTA determined that Sprout's comparable properties were more similar to the subject property in characteristics and markets than Weis's properties, even if they were located in a broader geographical area. The BTA's statement that Sprout's selection of comparable properties "best represented the market in which the subject property would operate" is reasonable if the "market" is defined in this broader sense, rather than as Montgomery County. We reject Ryne's assertion that this statement by the BTA "makes no sense whatsoever" and is "literally impossible."[8]

{¶ 39} Ryne also focuses much of his argument on the fact that the two appraisers expressed different opinions about whether the Wilmington Pike McDonald's was a

---

[8] Nor do we agree with Ryne's argument that the Sprout report "strangely chose" an appraisal method, that the BTA's decision is "not merely unreasonable, but shocking," that the Sprout testimony "laughably referr[ed]" to certain building features, that the BTA engaged in "[s]loppy reasoning," that Sprout made "outlandish claims," that the BTA's reasoning was "lazy and factually inaccurate," that the BTA failed "to employ common sense and good judgment in evaluating [Sprout's] appraisal report," or that Sprout "magically conclude[d]" a higher value than the BOR.

special purpose property. However, Sprout did not value the property as a special-purpose property, even though he believed that it could have been treated as such. Accordingly, Sprout's observation that the Wilmington Pike McDonald's might have been classified as a special-purpose property was inconsequential to the BTA's decision; in fact, the BTA specifically noted that Sprout did not appraise the property as a special-purpose property. Under these circumstances, there was no reason for the BTA to "conspicuously" identify the unique physical nature of the property, as Ryne suggests.

{¶ 40} Further, Ryne asserts that Sprout's analysis was inferior to Weis's because Sprout's qualitative adjustments of the comparable properties were less reliable than Weis's qualitative and quantitative ones,[9] and because Sprout did not provide market support for his conclusions. The BTA could have reasonably concluded that Sprout did provide market support for his conclusions. Moreover, the BTA noted in its decision that it "has repeatedly recognized the permissibility of qualitative adjustments, rather than quantitative adjustments," and found no fault with Sprout's adjustments on that basis. Although Ryne characterized Sprout's adjustments as "conjecture," both experts adjusted for similar factors, such as location or condition of the building. We fail to see how Sprout's adjustments were more unsubstantiated that Weis's.

{¶ 41} Ryne brings to our attention another case involving a McDonald's valuation in which both Weis and Sprout participated as appraisers, *Bd. of Edn. of the Brookville Local Schools v. Montgomery Cty. Bd. of Revision*, BTA Case No. 2016-325. In that case, the appraisers valued a McDonald's "at the end of its economic life," which was slated to be demolished and replaced and where the restaurant's age "greatly impact[ed]"

---

[9] The BTA described Weis's adjustments only as "quantitative."

its value. In that case, the BTA relied on Weis's selection of comparables, rather than Sprout's, in determining the true value of the property.

{¶ 42} Ryne suggests that we should conclude that Sprout's position in the *Brookville* case was unreasonable, based on the evidence presented in that case (which is not before us) and the BTA's adoption of Weis's valuation in that case. Ryne further reasons that the result in the *Brookville* case should cause us to reject Sprout's appraisal in this case and in three other pending tax appeals involving McDonald's restaurants. There are many flaws in this reasoning, including that each case is factually different, that we do not have the record and evidence from the *Brookville* case, and that the BTA's rejection of the valuation provided by an appraiser in one case does not automatically impugn that appraiser's qualifications or his opinion in any other case. One may even argue that the BTA's differing conclusions demonstrate its ability to weigh facts unique to each case.

{¶ 43} Ryne also cites *Rite Aid of Ohio, Inc., v. Washington Cty. Bd. of Revision*, 146 Ohio St.3d 173, 2016-Ohio-371, 54 N.E.3d 1177, which he describes as "a nearly identical case." We agree that *Rite Aid* was similar to this case in that: 1) "The disparity of valuations [was] striking," as Rite Aid's appraiser valued the property at $1,150,000, and the county's appraiser valued it at $2,400,000, *id.* at ¶ 15; 2) the appraiser for Rite Aid looked at comparable general retail properties for sale or lease in the same geographic area as the Rite Aid in Marietta, Ohio (including one across the Ohio River in West Virginia), while the county's appraiser looked for comparable drugstores, specifically, which led to the use of properties that were more geographically distant within the state; and 3) both appraisers used the income approach and sales comparison

approach, and then reconciled those two results in their appraisals.

{¶ 44} The BTA adopted Rite Aid's lower valuation. In a "terse" decision, the BTA found that the county's comparables, "while potentially appropriate," were drawn from an unnecessarily narrow pool of properties. *Id.* at ¶ 16. The supreme court agreed; it concluded that the county's appraiser had essentially treated the Rite Aid as a special-use property, which its characteristics did not justify, and therefore that the BTA "was justified in rejecting" the county's appraisal and adopting Rite Aid's appraisal. The supreme court also criticized the county's argument that properties encumbered by a lease at the time of sale could be compared with unencumbered properties, without adjustment for this difference, "[p]recisely because the lease affects the sale price and value." *Id.* at ¶ 20. Insofar as Sprout's appraisal did not treat the Wilmington Pike McDonald's as a special-purpose property, and it incorporated very specific information about any existing leases on the properties in determining whether upward or downward adjustments in value were appropriate, we are unpersuaded that the BTA's decision conflicts with the holding in *Rite Aid.*

{¶ 45} Ryne also claims that the BTA erred in "applying the holding" of *Johnston Coca-Cola Bottling Co. v. Hamilton Cty. Bd. of Revision*, 149 Ohio St.3d 155, 2017-Ohio-870, 73 N.E.3d 503, because that case involved the valuation of an enormous bottling plant which was dissimilar to the McDonald's property. *Johnston Coca-Cola* reaffirmed the supreme court's view that a property's present-use may not be considered to the exclusion of other factors in determining its value. *Id.* at ¶ 14. However, we have previously stated and the BTA observed that Sprout did not value the Wilmington Pike McDonald's as a special-purpose property. Likewise, he did not value it based solely on

its present use as a McDonald's. In *Johnston Coca-Cola*, the BTA referred to the subject property's current use as a bottling company, but "it did so in the context of deciding which comparables identified by the appraisers were 'more analogous' under the sales-comparison approach," which was not improper. *Id.* at ¶ 16. As in this case, the appraisers in *Johnston Coca-Cola* used "the sales-comparison and income approaches, two accepted methods of analysis." *Id.* at ¶ 15. *Johnston Coca-Cola* does not present any basis to conclude that the valuations in this case were problematic.

**{¶ 46}** Finally, Ryne contends that the BTA acted unreasonably and unlawfully and abused its discretion in "continuing to recognize" Sprout as an expert at all. Ryne suggests that he (Ryne) discredited or impeached Sprout such that the BTA should have doubted whether Sprout "ha[d] experience in appraising fast-food restaurants" or was "familiar with the neighborhood in which the Subject Property is located." The record does not support this argument. The appraisers agreed that the highest and best use of the property was as a restaurant. Sprout viewed it more narrowly as a fast-food restaurant, and he provided specific reasons for doing so, including the location and the building design's amenability to a high volume of drive-thru business. The BTA provided a detailed discussion of how it weighed the experts' opinions and methodology, including specific criticisms of the properties Weis used as comparables and the capitalization rates derived from them. Ryne obviously disagrees with Sprout's conclusions, but nothing in the record suggests that Sprout was unqualified, that his choice of comparable properties or his calculations was unreasonable, or that his valuation should have been disregarded because he lacked appropriate qualifications.[10]

---

[10] Ryne says that Sprout "admitted that he is <u>not</u> an expert and once he made such a

{¶ 47} The BTA's decision acknowledged that, "inherent in the appraisal process is the fact that an appraiser must make a wide variety of subjective judgments" in selecting data upon which to rely, making adjustments to make such data "usable," and interpreting and evaluating the information gathered in forming an opinion. Likewise, the BTA must use its judgment in determining which evidence presents the most credible valuation. Here, the BTA relied on credible evidence from an appraiser, who presented support for his positions. Based on the record before us, we conclude that the BTA's determination was reasonable and lawful.

{¶ 48} The assignments of error are overruled.

{¶ 49} The Decision and Order of the BTA will be affirmed.

. . . . . . . . . . . . .


WELBAUM, P.J. and Hall, J., concur.


Copies mailed to:

Karol C. Fox
Mark H. Gillis
Adam Laugle
Joseph W. Testa, Ohio Tax Commissioner
Charles L. Bluestone
Patrick J. Heery

---

telling admission no longer should have been recognized as an expert witness by the BTA." (Emphasis sic.) But the record reflects that the parties stipulated to Sprout's qualifications and that the BTA found Sprout to be an "expert qualified to render an opinion on the subject property's value."